UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
JARRETH JOSEPH,

                 Plaintiff,

            - against -

NEW YORK CITY POLICE LIEUTENANT "JOHN DOE", NEW YORK CITY POLICE OFFICER "JOHN DOE 1", NEW YORK CITY POLICE OFFICER "JOHN DOE 2", NEW YORK CITY POLICE OFFICER "JOHN DOE 3", and THE CITY OF NEW YORK,

                 Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
16-CV-2004 (PKC) (LB)

PAMELA K. CHEN, United States District Judge:

      Plaintiff Jarreth Joseph brings this action under 42 U.S.C. § 1983 against the City of New York (the "City") and four employees of the New York City Police Department ("NYPD"), alleging that he was subjected to an unconstitutional search and seizure, false arrest, and excessive force. The City has moved to dismiss Plaintiff's claim for municipal liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). For the reasons stated below, the City's motion to dismiss is granted.

## BACKGROUND

**I.    Relevant Facts**[1]

      On or about August 15, 2014, Defendant NYPD Lieutenant John Doe (the "Lieutenant") and three Defendant NYPD "John Doe" Officers (collectively referred to as "John Doe Officers

---

[1] The Court draws all relevant allegations, taken as true pursuant to Federal Rule of Civil Procedure 12, from Plaintiff's Amended Complaint (Dkt. No. 6). *See EEOC v. Port Auth. of N.Y.*

1

1-3") forcibly entered Plaintiff's home. (Amended Complaint, Dkt. No. 6 ("Complaint" or "Compl."), ¶ 23.) The Lieutenant and Officers 1-3 did not have a valid search warrant for the premises. (*Id.* ¶ 28.) After frisking and verbally swearing at Plaintiff, the Lieutenant and John Doe Officers 1-3 handcuffed Plaintiff and removed him from his home. (*Id.* ¶¶ 24-26.) The Lieutenant and John Doe Officers 1-3 then searched Plaintiff's home without permission and removed approximately eight thousand dollars. (*Id.* ¶¶ 27, 29.)

Following these events, the Lieutenant and John Doe Officers 1-3 escorted Plaintiff to the NYPD's 67th Precinct stationhouse, where they proceeded to strike and kick Plaintiff's head and body. (*Id.* ¶¶ 30-31.) Shortly thereafter, Plaintiff was charged with trespassing in his own home in connection with the events described above. (*Id.* ¶ 32.) The charges against Plaintiff were later dismissed in their entirety. (*Id.* ¶ 33.)

With respect to his claim for municipal liability against the City,[2] Plaintiff alleges that before, during, and after the events described above, the City has had a "custom of entering private citizens['] homes without authorization to do so, unlawfully searching private citizens['] homes, arresting those citizens and assaulting and/or battering those same individuals." (*Id.* ¶¶ 35-36.) Plaintiff puts forward several factual allegations in support of this contention.

Plaintiff alleges three specific instances of unlawful NYPD searches. First, in February 2012, NYPD officers illegally entered the Bronx home of Ramarley Graham and fatally shot him.

---

*& N.J.*, 768 F.3d 247, 253 (2d Cir. 2014) ("[W]e accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.").

[2] As of the date of this order, John Doe Officers 1-3 have not been identified and thus the City is the only Defendant that has appeared in this action. The City is named only in Plaintiff's claim for municipal liability. (Compl. ¶¶ 52-58.) Accordingly, the factual background in this Order is limited to the allegations that are relevant to Plaintiff's claim for municipal liability against the City.

2

(*Id.* ¶ 37.)  Second, sometime in 2013 or 2014, NYPD officers "entered and ransacked" the Brooklyn home of Karen Jordan in search of her husband, who had died several years earlier. (*Id.* ¶¶ 38-39.)  Third, in 2015, NYPD officers, lacking an arrest warrant, entered the Brooklyn home of David Rivera and arrested him.  (*Id.* ¶ 40.)

In addition to pleading these three examples of unlawful searches, Plaintiff claims that, between 2010 and 2015, the New York City Civilian Complaint Review Board ("CCRB")[3] "substantiated approximately 180 cases of Police Officers improperly entering and searching the homes of New York City residents."  (Compl. ¶ 41.)  Plaintiff then cites a March 1, 2015 report by a New York City newspaper, *The Gothamist*, stating that 36 percent of the officers involved in the unlawful searches identified by the CCRB were not disciplined.  (*Id.*)  Plaintiff also cites an article from *The New York Times*,[4] in which an NYPD spokesman stated, in regard to the CCRB finding, that the NYPD would "decide if this is something that needs to be more clearly clarified." (*Id.* ¶ 42.)  Finally, Plaintiff notes that in September 2015 the Mount Vernon City Council "launched an investigation into members [of the] NYPD entering areas outside their jurisdiction, and searching the homes of Westchester County residents without consent or legal authority." (*Id.* ¶ 43.)

Plaintiff also makes several allegations regarding an alleged unwritten arrest quota maintained by the NYPD, which he argues encourages NYPD officers to "conduct unlawful searches and seizures."  (Compl. ¶ 44.)  Plaintiff first alleges that, in 2012, NYPD Officer Craig

---

[3] The CCRB is an independent agency "empowered to receive, investigate, mediate, hear, make findings, and recommend action on complaints against New York City police officers." *About CCRB*, NYC.GOV, http://www1.nyc.gov/site/ccrb/about/about.page (last visited September 19, 2017).

[4] Al Baker, *Review Agency Faults New York Police Department on Unlawful Searches*, N.Y. TIMES (Feb. 29, 2016), https://www.nytimes.com/2016/03/01/nyregion/new-york-police-faulted-by-agency-for-unlawful-searches.html.

3

Matthews filed a lawsuit concerning these "unwritten and unlawful practices." (*Id.* ¶ 45.) Next, Plaintiff alleges that three NYPD officers have "recorded supervising officers telling them to unlawfully search, detain, and arrest individuals," although he does not specify when or where these recordings took place. (*Id.*) Finally, Plaintiff alleges that in March 2016 "numerous NYPD [o]fficers from the Bronx and Brooklyn went on record stating" they were ordered to conduct unlawful searches to fill unwritten arrest quotas. (*Id.* ¶ 46.)

## II. Procedural History

Plaintiff filed the original complaint in this action on April 23, 2016, alleging violations of 42 U.S.C. §1983 ("Section 1983"), 42 U.S.C. §1988, and the Fourth and Fourteenth Amendments to the United States Constitution against the Lieutenant, John Doe Officers 1-3, and the City. (Dkt. No. 1.) Plaintiff then filed an amended complaint on July 29, 2016, in which he added factual allegations of NYPD policies and customs related to searches and seizures. (Compl., Dkt. No. 6.) The John Doe Officers and the Lieutenant have not been identified. (*Id.*) On November 29, 2016, the City filed a motion pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiff's claim against it for municipal liability. (Dkt. No. 15.)

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

*Id.* Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. In addressing a motion to dismiss, the court must accept as true all factual allegations and draw all inferences in favor of the non-moving party. *EEOC*, 768 F.3d at 253; *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).

In determining whether a plaintiff has adequately stated a plausible claim, "a court may consider 'documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiff['s] possession or of which plaintiff[] had knowledge and relied on in bringing suit.'" *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)). Where a complaint seeks to rely on judicial records, public reports, news articles, or press releases to state a claim for relief, "the Court takes judicial notice of [such documents], but for the limited purpose of establishing their existence and legal effect, and determining the statements that they contain without assuming the truth of those statements." *Li v. City of N.Y.*, No. 15 Civ. 1599, 2017 WL 1208422, at *4 (E.D.N.Y. Mar. 31, 2017).

## DISCUSSION

To hold a municipality liable under Section 1983 for constitutional violations committed by its employees, a plaintiff must prove three elements: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)). For purposes of its motion to dismiss, the City does not dispute that Plaintiff has sufficiently alleged a denial of a constitutional right based on his claims that John Doe Officers 1-3 arrested Plaintiff and forcibly entered, searched, and seized property from his home, all without a search

warrant. (*See* Dkt. No. 15-2 ("Def.'s Br.") at 4.)[5] The City argues, however, that Plaintiff has failed to allege an official policy or "permanent and widespread" custom that caused the alleged constitutional deprivation. (*Id.* at 7)

As another court in this Circuit recently explained, the requirement to plead "an official policy or custom" may be satisfied by alleging the existence of any of the following circumstances:

> (1) a formal policy, (2) actions taken or decisions made by final municipal policymakers that caused the violation of plaintiff's rights, (3) a practice so persistent and widespread that it constitutes a "custom or usage" and implies the constructive knowledge of policymakers, or (4) a failure to properly train or supervise municipal employees that amounts to "deliberate indifference to the rights of those with whom municipal employees will come into contact."

*Aquino v. City of N.Y.*, No. 16 Civ. 1577, 2017 WL 384354, at *3 (S.D.N.Y. Jan. 25, 2017) (citations omitted). Because Plaintiff does not allege that the City has a formal policy instructing officers to conduct unlawful searches and seizures, the Court addresses the potential for municipal liability based only on (1) the actions or decisions of a "final policymaker," (2) a "widespread custom or practice," or (3) a "failure to properly train or supervise" municipal employees.

## I.   The Lieutenant Is Not a Final Policymaker

If a municipal official has "final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy." *Clue v. Johnson*, 179 F.3d 57, 62 (2d Cir. 1999) (quoting *Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983)). Whether an official possesses final policymaking authority is a question of state law. *City of St.*

---

[5] The Amended Complaint does not allege any facts suggesting a formal policy, practice, or custom that allegedly caused John Doe Officers 1-3 to apply excessive force to Plaintiff in the course of his arrest. (Dkt. No. 6.) Accordingly, the Court construes Plaintiff's claim against the City as a claim of municipal liability based on the individual Defendants' allegedly unlawful search of Plaintiff's home and the allegedly unlawful seizure of Plaintiff and his property, *i.e.*, eight thousand dollars.

6

*Louis v. Praprotnik*, 485 U.S. 112, 124 (1988). In order to determine whether an individual possesses final policymaking authority, a court must examine "the relevant legal materials, including state and local positive law, as well as 'custom or usage' having the force of law." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (quoting *Praprotnik*, at 124).

Here, Plaintiff does not allege any facts suggesting that the Lieutenant was a final policymaker with respect to Plaintiff's arrest or the search of his house and seizure of his money. In fact, Plaintiff's only allegation even suggesting that the Lieutenant was a final policymaker is found in Plaintiff's assertion that John Doe Officers 1-3 were at all times "acting under the direction of, and pursuant to the instructions of [the Lieutenant], who was acting as their NYPD supervisor." (Compl. ¶ 20.) The mere assertion that the Lieutenant was responsible for supervising the other Defendants is insufficient. The Lieutenant "must be responsible for establishing final government policy in order for municipal liability to attach." *Anthony v. City of N.Y.*, 339 F.3d 129, 139 (2d Cir. 2003) (quotation omitted). The authority to supervise a particular search and seizure does not equate to the general authority to establish NYPD policy with respect to such searches and seizures. *See id.* at 140 ("We . . . reject [plaintiff's] argument that Sergeant Mendez's order [to seize plaintiff] constitutes an official municipal policy."); *Green v. City of Mt. Vernon*, 96 F. Supp. 3d 263, 303 (S.D.N.Y. 2015) ("Although Plaintiffs allege that [Sergeant] Scott was supervising the search, they do not allege any facts that would allow the Court to plausibly infer that Scott was a final policymaker."); *Cerbelli v. City of N.Y.*, No. 99 Civ. 6846, 2008 WL 4449634, at *12 n.19 (E.D.N.Y. Oct. 1, 2008) ("Plaintiff asserts her *Monell* claims against Lt.

McBride and Sgt. Barreto as well as the City. These claims must fail, however, because NYPD officers of their rank do not qualify as policymakers." (citations omitted)).[6]

In sum, Plaintiff does not allege facts sufficient to support a plausible inference that the Lieutenant possessed final policymaking authority with respect to the search, seizure, and arrest underlying Plaintiff's claims in this lawsuit.

## II. Plaintiff Has Not Adequately Alleged an Unofficial Policy or Custom

In order to establish *Monell* liability based on the existence of an unofficial policy or custom, a plaintiff must present evidence that the practice is "so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "[T]he mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Dwares v. City of N.Y.*, 985 F.2d 94, 100 (2d Cir. 1993)).

The Complaint attempts to allege an NYPD custom of "entering private citizens['] homes without authorization to do so, unlawfully searching private citizens['] homes, arresting those citizens and assaulting and/or battering those same individuals." (Compl. ¶ 36.) The Complaint also alleges that "[t]he City further maintains an unwritten quota policy, which pressures and encourages police officers to fulfill arrest quotas, and to conduct unlawful searches and seizures

---

[6] Furthermore, Plaintiff points to neither any state law nor any local custom that would lead to the conclusion that the City has vested Defendant NYPD Lieutenant with policymaking authority. Instead, Plaintiff makes repeated conclusory assertions that "it is reasonable for the Court to conclude that [the Lieutenant] was the final decisionmaker." (Dkt. No. 14 (Pl.'s Opp'n) at 6.) It is well established that such bare assertions are insufficient to establish *Monell* liability. *See Dwares v. City of N.Y.*, 985 F.2d 94, 100 (2d Cir. 1993); *Plair v. City of N.Y.*, 789 F. Supp. 2d 459, 468-69 (S.D.N.Y. 2011).

8

of New York City Residents; and allows NYPD Police Officers, including the Defendants named herein, to believe that their illegal actions will go unpunished." (*Id.* ¶ 44.)

As a preliminary matter, the Court finds that Plaintiff has failed utterly to allege facts tending to show an NYPD policy of "assaulting and/or battering" arrestees. (*See generally* Compl.) The Court also finds that Plaintiff has failed to demonstrate, either through factual pleadings or any kind of argumentation, how the NYPD's alleged "unwritten quota policy" caused the individual Defendants in this action "to believe that their illegal actions [would] go unpunished." (*Id.* ¶ 44) Accordingly, the Court need only consider whether Plaintiff has alleged facts giving rise to an inference that the NYPD has a widespread custom of conducting unlawful searches, seizures, and arrests in order to meet unwritten arrest quotas.

Reading the Complaint as a whole, the Court finds that Plaintiff has not plausibly alleged a custom of conducting unlawful searches, seizures, and arrests in order to meet unwritten arrest quotas that is so widespread as to "practically have the force of law." *Connick*, 563 U.S. at 61.

In an effort to plead a widespread custom of unlawful searches, seizures, and arrests, Plaintiff points to three specific instances of unlawful entry and search by the NYPD, and to the CCRB's substantiation of "approximately 180 cases of Police Officers improperly entering and searching the homes of New York City residents" between 2010 and 2015. (Compl. ¶¶ 37-39, 41.) Plaintiff does not allege, however, the total number of searches conducted in the same time period by the NYPD.[7] Absent that statistic, the Court is unable to evaluate the significance of the three

---

[7] As the City notes, a *New York Times* article cited by Plaintiff for a different point asserts that roughly 15,000 total searches by the NYPD occurred between 2010 and 2015. *See* Baker, *supra* note 4; (*see also* Compl. ¶ 42). The Court, however, need not, and does not, rely on this information in finding Plaintiff's Complaint insufficient. The Court merely notes this information to demonstrate how such data is necessary to assess the significance of the allegations in the Complaint.

instances of unlawful entry and search or the CCRB statistic that Plaintiff cites, let alone infer a widespread custom within the NYPD of illegal entry, searches, or arrests. *See Burgis v. N.Y. City Dep't of Sanitation*, 798 F.3d 63, 70 (2d Cir. 2015) ("Among other shortcomings, the statistics provided by plaintiffs show only the raw percentages of White, Black, and Hispanic individuals at each employment level, without providing any detail as to the number of individuals at each level, the qualifications of individuals in the applicant pool and of those hired for each position, or the number of openings at each level."); *Lomotey v. Conn. Dep't of Transp.*, 355 F. App'x 478, 481 (2d Cir. 2009) ("Lomotey's evidence that only Caucasians were selected for these placements amounts to nothing more than raw numbers which, without further information on key considerations such as the racial composition of the qualified labor pool, cannot support an inference of discrimination."). The fact that NYPD officers have conducted illegal entries, searches, and arrests on numerous occasions, however unfortunate, standing alone, does not support an inference of an unofficial policy or practice at the NYPD.

Plaintiff next points to a *New York Times* article, dated February 26, 2016, in which an NYPD spokesman is quoted as stating, in regard to the unlawful searches substantiated by the CCRB, that the NYPD will "decide if this is something that needs to be more clearly clarified." (Compl. ¶ 42.) But that statement cannot be fairly construed as an admission that the CCRB's findings are statistically significant evidence of a widespread custom of conducting unlawful searches, much less a statement of official policy encouraging such unlawful searches. If anything, it suggests that the NYPD treats unlawful searches as deviations from NYPD policy and that the NYPD planned to consider whether the NYPD's policies need clarification to reduce the risk of similar incidents in the future.

Finally, as supposed evidence of a widespread custom of unlawful searches, Plaintiff alleges that, in 2015, the Mount Vernon City Council launched an investigation relating to NYPD officers entering areas outside of their jurisdiction and illegally searching homes. (Compl. ¶ 43.) But, Plaintiff does not indicate the results of that investigation and the mere existence of the investigation does little to establish a custom of illegally searching homes. *See Marom v. City of N.Y.*, No. 15 Civ. 2017, 2016 WL 916424, at *22 (S.D.N.Y. Mar. 7, 2016) ("[T]he allegations concerning previous section 1983 lawsuits fail to explain which—if any— lawsuits led to findings of liability against the NYPD for constitutional violations.") (dismissing *Monell* claim against the City).[8]

In sum, in determining whether Plaintiff has plausibly alleged a widespread custom or practice, the Court gives little weight to Plaintiff's assertions regarding the CCRB findings, the specific instances of unlawful entry, the NYPD spokesperson's comment, and the Mount Vernon investigation.

This leaves Plaintiff's allegations regarding the 2012 lawsuit brought by Craig Matthews alleging that NYPD officers were engaging in unlawful conduct to meet unwritten arrest quotas, the three recordings of NYPD supervisors ordering NYPD officers to make illegal arrests, and the "numerous" NYPD officers in Brooklyn and the Bronx who alleged the existence of unwritten arrest quotas.

---

[8] Even assuming that NYPD officers have conducted unlawful entries or searches in the past, there is nothing in the Complaint from which to infer that the circumstances in those cases were sufficiently similar to the present case. Lacking information regarding those circumstances, the Court cannot infer that what allegedly happened to Plaintiff reflects, or was pursuant to, an existing NYPD custom or practice. *See Aquino v. City of N.Y.*, No. 16 Civ. 1577, 2017 WL 384354, at *4 (S.D.N.Y. Jan. 25, 2017) (declining to infer a custom where the supporting factual allegations were sufficiently distinct).

With respect to the 2012 lawsuit brought by NYPD Officer Craig Matthews, the Court notes that Plaintiff once again does not assert whether the lawsuit resulted in a finding of liability, which mitigates the impact of this allegation. *See Marom*, 2016 WL 916424, at *22. Furthermore, a single lawsuit does not constitute enough evidence to infer a widespread custom. *See Cruz v. City of N.Y.*, No. 15 Civ. 2265, 2016 WL 234853, at *5 (S.D.N.Y. Jan. 19, 2016) ("[E]ight cases cited from a municipality (New York) far bigger than Newburgh, makes the number of cited cases particularly inadequate to demonstrate plausibly a municipal custom.").

With respect to Plaintiff's assertion that three NYPD officers recorded supervising officers telling them to perform unlawful searches, the Court finds that, although relevant, the testimony of only three officers out of tens of thousands of officers employed by the NYPD does little to establish a department-wide custom of unlawful arrests and unwritten arrest quotas. *See Jones v. Town of E. Haven*, 691 F.3d 72, 85 (2d Cir. 2012) (holding that three instances of misconduct over a number of years "fell far short of showing a policy, custom, or usage of officers"); *see also Rubio v. Cnty. of Suffolk*, 328 F. App'x 36, 38 (2d Cir. 2009) (holding that "a few violations by a small group of subordinate County employees with no policymaking authority cannot amount to the pervasive and widespread custom or practice necessary for municipal liability" (quoting *Rubio v. Cnty. of Suffolk*, No. 01 Civ. 1806, 2007 WL 2993833, *4 (E.D.N.Y. Oct. 9, 2007)) (brackets omitted)).

Finally, the Court also accords little weight to Plaintiff's vague assertion that "numerous NYPD [o]fficers from the Bronx and Brooklyn went on record stating that they were ordered to unlawfully search and arrest minority males in order to fulfill unwritten arrest quota policies." (Compl. ¶ 46.) Plaintiff has not specified the number of officers who came forward relative to the total number of officers employed by the NYPD, nor has he identified any written record of those

12

statements or indicated whether these allegations were ever substantiated or proven. *See Cruz*, 2016 WL 234853, at *5 ("None of the lawsuits cited resulted in an adjudication or admission of liability and the number of suits does not suggest a pervasive illegal practice."). Such unsubstantiated and undocumented assertions by a handful of officers is simply not enough to infer a widespread custom or practice. Furthermore, even assuming the existence of such an unofficial custom or practice, Plaintiff has failed to allege any facts showing that his search and arrest were the result of such a custom or practice.

Having reviewed each of Plaintiff's *Monell* allegations individually, the Court now considers them as a whole. In assessing whether Plaintiff has plausibly alleged a custom of unlawful searches, seizures, and arrests to meet unwritten arrest quotas, the Court considers the Complaint in its entirety and "draw[s] on its judicial experience and common sense" in reaching a decision. *Iqbal*, 556 U.S. at 679. Relying on the above principles, the Court concludes that Plaintiff has "not nudged [his] claim[] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570; s*ee also Arbuckle v. City of N.Y.*, No. 14 Civ. 10248, 2016 WL 5793741, at *17 (S.D.N.Y. Sept. 30, 2016) (dismissing *Monell* claim where the plaintiff's assertions consisted of several previous occasions of Fourth Amendment violations by the police combined with a number of lawsuits brought against the city); *Tieman v. City of Newburgh*, No. 13 Civ. 4178, 2015 WL 1379652, at *17 (S.D.N.Y. Mar. 26, 2015) ("The lawsuits cited by Plaintiff in the [complaint], even when combined with the allegations regarding the public forum comments and [related reports], are insufficient to plausibly support an inference of a widespread custom."); *Collins v. City of N.Y.*, 923 F. Supp. 2d 462, 479 (E.D.N.Y. 2013) ("Further, the Court agrees with the City that the litany of other police-misconduct cases are insufficient to make a plausible case for *Monell* liability."); *Marom*, 2016 WL 916424, at *21 (holding that prior instances of abuse combined with

several lawsuits were not "sufficient factual content tending to show, even circumstantially, the existence of municipal policies and practices responsible for the plaintiffs['] constitutional deprivations"). As the Court previously noted, while the occurrence of illegal acts by NYPD officers is a documented and unfortunate fact, these incidents do not give rise to a reasonable inference of a custom or policy by the NYPD to engage in such conduct, as opposed to the isolated, unauthorized conduct of a few officers within the NYPD's vast ranks.

Therefore, Plaintiff has not plausibly alleged a widespread NYPD custom of unlawful searches, seizures, and arrests to meet unwritten arrest quotas.[9]

### III. Plaintiff Has Not Adequately Alleged a Failure to Train

A plaintiff may establish municipal liability in limited circumstances where there is such a deficiency in the training of government employees as to establish deliberate indifference to the rights of the public. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). The "deliberate indifference" standard sets a high bar for failure-to-train cases: "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *City of Canton*, 489 U.S. at 389. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown* ("*Brown*"), 520 U.S. 397, 409 (1991)).

---

[9] Having found that the Complaint does not adequately allege a widespread custom, the Court does not reach the question of whether the Complaint has alleged a causal connection between any widespread custom and the alleged violations of Plaintiff's constitutional rights in this particular case. The Court has noted, however, that Plaintiff has failed to allege facts supporting such a connection.

The Second Circuit requires plaintiffs to adequately plead three elements to allege the "deliberate indifference" required to sustain a failure-to-train claim: (1) the municipality knows "to a moral certainty" that its employees will confront a given situation, (2) either the situation presents employees with a "difficult choice of the sort that training . . . will make less difficult," or there is a "history of employees mishandling the situation," and (3) the "wrong choice" by the employee will frequently cause a constitutional deprivation. *Walker v. City of N.Y.*, 974 F.2d 293, 297-98 (2d Cir. 1992).

As a threshold matter, the Court easily finds that Plaintiff has adequately alleged the first and third elements of a "deliberate indifference" claim. As to the first element, the Court finds based on common sense and the allegations in the Complaint that the NYPD "knows 'to a moral certainty'" that NYPD officers will encounter situations where they will have to conduct searches of homes and make seizures of persons and property. (*See* Compl. ¶¶ 14, 18, 41); *see also Marom*, 2016 WL 916424, at *22 ("NYPD decision makers are aware that their officers, at some point, will need to arrest protestors taking part in a large demonstration."); *City of Canton*, 489 U.S. at 390 n. 10 ("For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons."). As to the third element, the Court infers that "wrong choice[s]" by NYPD officers with respect to the searches of homes and seizures of persons and property "will frequently cause a constitutional deprivation." (*See* Compl. ¶¶ 12-13, 37-41); *see also Marom*, 2016 WL 916424, at *22 ("It is plausible to infer from the [First Amended Complaint], and is matter of general common sense, that . . . NYPD officers mishandling large protests could cause constitutional deprivations."); *Walker*, 974 F.2d at 299 ("[A] failure by police officers to resist . . . opportunities [to commit perjury] will almost certainly result in deprivations of constitutional rights.").

The same cannot be said for the second element of Plaintiff's claim. As a preliminary matter, the Court notes that "contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide 'notice to the cit[y] and the opportunity to conform to constitutional dictates'" with respect to failure to train claims. *Connick*, 563 U.S. at 63 n.7 (citing *City of Canton*, 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part)); *see also Johnson v. City of N.Y.*, No. 15 Civ. 8195, 2017 WL 2312924, at *21 (S.D.N.Y. May 26, 2017) ("More to the point, it is not possible as a temporal matter that either of these two incidents of mistaken identity—which are the very events at issue in this lawsuit—could have put the City on notice of a training deficiency and provided the City with an opportunity to adjust its training accordingly prior to the events at issue in this lawsuit."). Therefore, in determining whether Plaintiff has plausibly alleged a failure to train, the Court considers only those relevant factual allegations that occurred before Plaintiff's arrest in August 2014.

The relevant factual allegations that occurred before Plaintiff's arrest, described in detail in Section II above, include the pre-August-2014 unlawful searches substantiated by the CCRB, two specific instances of unlawful searches by the NYPD,[10] the 2012 lawsuit brought by Officer Matthews, and the recordings of NYPD supervisors ordering officers to execute unlawful arrests. Ultimately, the Court finds that these allegations, taken together, do not lead to a plausible finding of the "pattern of similar constitutional violations by untrained employees" necessary to allege a failure to train. *Connick*, 563 U.S. at 62.

---

[10] As noted previously, Plaintiff alleges a third instance of unlawful entry into the Brooklyn home of David Rivera. (*See* Compl. ¶ 40.) Because this incident took place in March 2015, several months after Plaintiff's arrest, the Court disregards this arrest for purposes of concluding whether Plaintiff successfully pleads a failure to train. *See Connick*, 563 U.S. at 63 n.7.

First, as pointed out by the City in its motion to dismiss, "[P]laintiff has failed to even allege that any of these prior incidents [referring to both the specific instances alleged as well as those substantiated by the CCRB] were constitutional violations." (Def.'s Br. at 11.)[11] Municipal liability based on a failure to train typically rests on a showing that the municipality was "on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights." *Connick*, 563 U.S. at 61. While "a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations," the Plaintiff has failed to allege any specifics concerning the 180 instances of unlawful searches and seizures substantiated by the CCRB. *Brown*, 520 U.S. at 409. Absent an allegation of a commonality or pattern among those 180 instances, the NYPD cannot be charged with constructive notice of a specific deficiency in its search and seizure training protocols. *See Lehal v. Cent. Falls Det. Facility Corp.*, No. 13 Civ. 3923, 2016 WL 7377238, at *11 (S.D.N.Y. Nov. 21, 2016) (holding a number of unrelated allegations insufficient to establish a failure-to-train claim); *Pluma v. City of N.Y.*, No. 13 Civ. 2017, 2015 WL 1623828, at *12 (S.D.N.Y. Mar. 31, 2015) (dismissing failure-to-train claim where plaintiff relied on a number of dissimilar incidents of inappropriate deployment of pepper spray by NYPD).

---

[11] The CCRB's finding that a claim of improper entry, search, or arrest is "substantiated" means that "the acts alleged occurred and constituted misconduct." It is ambiguous whether a finding of "substantiated" misconduct by a CCRB panel necessarily implicates a federal constitutional violation. The CCRB report identifies the New York State Constitution, NYPD Control Guide, NYPD Operations Orders and Legal Bulletins, and the NYPD training curriculum as the "four principal sources of authority" for NYPD officers conducting searches and seizures in homes. Findings of "substantiated" misconduct by the CCRB may therefore be based on this broader body of law. *See* CIVILIAN COMPLAINT REVIEW BOARD, CROSSING THE THRESHOLD: AN EVALUATION OF CIVILIAN COMPLAINTS OF IMPROPER ENTRIES AND SEARCHES BY THE NYPD FROM JANUARY 2010 TO OCTOBER 2015 12-24 (2015), *available at* http://www.nyc.gov/html/ccrb/downloads/pdf/entry-search-report_20160219.pdf.

Second, the Court considers the 2012 Matthews lawsuit and the recordings taken by NYPD officers of NYPD supervisors giving instructions to meet unwritten arrest quotas. A single lawsuit is insufficient to establish a pattern of unconstitutional deprivations and Plaintiff does not point to any testimony from the lawsuit that would indicate a pattern of misconduct to support an inference that the NYPD was on notice of a training deficiency. *See Hays v. City of N.Y.*, No. 14 Civ. 10126, 2017 WL 782496, at *7 (S.D.N.Y. Feb. 28, 2017) (holding "unproven allegations made in other lawsuits" insufficient to establish deliberate indifference). Similarly, three examples of police officers carrying out unlawful arrests is not enough to plausibly allege a pattern of violations in a police department consisting of tens of thousands of officers. *Johnson*, 2017 WL 2312924, at *20 (holding two instances of misconduct insufficient to put the City on notice of a training deficiency). After taking into account the size of the NYPD, as well as "the high standard required to allege that the City [is] on notice that its training program [is] . . . deficient," *Pluma*, 2015 WL 1623828, at *12, the Court finds that Plaintiff has not pleaded enough facts to plausibly establish a pattern of violations necessary to establish deliberate indifference. *See Giaccio v. City of N.Y.*, 308 F. App'x 470, 472 (2d Cir. 2009) ("Yet he identifies, at most, only four examples where the defendants might have disclosed positive drug test results. This evidence falls far short of establishing a practice that is so persistent or widespread as to justify the imposition of municipal liability." (quotation omitted)); *Gonzalez v. Waterbury Police Dep't*, No. 12 Civ. 478, 2016 WL 953211, at *3 (D. Conn. Mar. 11, 2016) ("Out of the thousands of arrests that occurred in the City of Waterbury during the relevant period, there were only a handful of complaints of excessive force. Most importantly, only one of those cases resulted in a judgment in favor of the plaintiff. The information cited by [plaintiff] does not establish a pattern or practice of unconstitutional deprivations." (citations omitted)); *White v. City of N.Y.*, 206 F. Supp. 3d 920, 939 (S.D.N.Y. 2016)

(holding that six incidents over several years did not constitute a "pattern of similar constitutional violations, such that the City was on notice that different, or additional, training was needed").

For the same reasons, the Court cannot find that Plaintiff has stated a failure to train claim by showing that the alleged violation of Plaintiff's constitutional rights was a "highly predictable consequence of a failure to equip officers with specific tools to handle recurring situations." *Brown*, 520 U.S. at 409 ("[A] plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations" if "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.").

In sum, even construing all relevant factual allegations in the Complaint in Plaintiff's favor, the Court finds that Plaintiff has not plausibly alleged a widespread practice of constitutional violations sufficient to put the municipality on actual or constructive notice of a training deficiency.

## CONCLUSION

For the foregoing reasons, the City's motion to dismiss is granted in its entirety. Plaintiff's claims will proceed only against the Lieutenant and John Doe Officers 1-3.

SO ORDERED.

*/s/ Pamela K. Chen*

Pamela K. Chen
United States District Judge

Dated: September 22, 2017
      Brooklyn, New York